# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DAVID CHOW, Individually and on Behalf of All
Others Similarly Situated,

  Plaintiffs,

v.

PROSHARES TRUST, PROSHARE ADVISORS
LLC, SEI INVESTMENTS DISTRIBUTION CO.,
MICHAEL L. SAPIR, LOUIS M. MAYBERG,
RUSSELL S. REYNOLDS III, MICHAEL WACHS
and SIMON D. COLLIER,

  Defendants.

Civil No.: 10 CIV 3211

**RELATED CASE AFFIRMATION**

**JURY TRIAL DEMANDED**



RECEIVED
APR 15 2010
U.S.D.C. S.D.N.Y.
CASHIERS

I, AARON BRODY, hereby affirm the following:

1.    I am an attorney with the law firm of Stull, Stull & Brody, counsel for plaintiff in the above-captioned action which asserts the dissemination of false and misleading information by the defendants to the investing public.

2.    Upon information and belief, this action is related to the action captioned *Novick, et al. v. Proshares Trust et al.*, U.S.D.C., S.D.N.Y., Civil Action No. 1:09-cv-6935-JGK, which also asserts similar claims based upon the dissemination of false and misleading information by the defendants to the investing public.

3.    Accordingly, it is respectfully submitted that this action should be assigned as a related case to the Honorable John G. Koeltl.

Dated: April 15, 2010

_____
Aaron Brody

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| DAVID CHOW, Individually and on behalf of all others similarly situated, | Plaintiff, |
| -v- | |
| PROSHARES TRUST, ET AL., (see rider A for a listing of all Defendants), | Defendant. |

## 10 CV 3211

Case No. _____

**Rule 7.1 Statement**

RECEIVED
APR 15 2010
U.S.D.C. S.D.N.Y.
CASHIERS

Pursuant to Federal Rule of Civil Procedure 7.1 [formerly Local General Rule 1.9] and to enable District Judges and Magistrate Judges of the Court to evaluate possible disqualification or recusal, the undersigned counsel for

Plaintiff David Chow _____ (a private non-governmental party)

certifies that the following are corporate parents, affiliates and/or subsidiaries of said party, which are publicly held.

None

**Date:** April 15, 2010 _____

_____
**Signature of Attorney**

**Attorney Bar Code:** AB 5850 _____

Form Rule7_1.pdf  SDNY Web 10/2007

## RIDER A

Defendants:    Proshares Trust,
               Proshares Advisors LLC,
               SEI Investments Distribution Co.,
               Michael L. Sapir,
               Louis M. Mayberg,
               Russel S. Reynolds III,
               Michael Wachs,
               Simon D. Collier.

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

10 CIV 3211

DAVID CHOW, Individually and on Behalf of All
Others Similarly Situated,

          Plaintiffs,

v.

PROSHARES TRUST, PROSHARE ADVISORS
LLC, SEI INVESTMENTS DISTRIBUTION CO.,
MICHAEL L. SAPIR, LOUIS M. MAYBERG,
RUSSELL S. REYNOLDS III, MICHAEL WACHS
and SIMON D. COLLIER,

          Defendants.

**CLASS ACTION**

**COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**



RECEIVED
APR 15 2010
U.S.D.C. S.D. N.Y.
CASHIERS

        Plaintiff David Chow, individually and on behalf of all others similarly situated, by his

attorneys, alleges the following upon information and belief, except for those allegations as to

himself, which are alleged upon personal knowledge. The allegations are based upon counsel's

investigation, documents filed with the United States Government and Securities and Exchange

Commission (the "SEC"), and reports published in the press.

## SUMMARY OF THE ACTION

      1.     This is a class action on behalf of all persons who purchased or otherwise

acquired shares of the ProShares UltraShort SmallCap600 Fund (the "SDD Fund") (f/k/a the

UltraShort S&P Small-Cap 600), an exchange-traded fund ("ETF") offered by Defendant

ProShares Trust ("ProShares" or the "Trust"), pursuant or traceable to ProShares' false and

misleading Registration Statement, Prospectuses, and Statements of Additional Information

issued in connection with the SDD Fund's shares (the "Class"). Plaintiff is seeking to pursue

remedies under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act").

2.     ProShares consists of a portfolio of 90 ETFs, including the SDD Fund.  ETFs, regulated by the SEC under the Investment Company Act of 1940 (the "1940 Act"), are funds that track a particular stock index.  After being issued, shares in the ETFs are bought and sold on secondary exchanges, or aftermarkets, such as the New York Stock Exchange or NASDAQ.

3.     Non-traditional, or so-called "leveraged" and/or "inverse" ETFs, such as the SDD Fund, have attracted increasingly significant investor assets.

4.     ProShares manages approximately 99 percent of the country's short and leveraged ETFs and, overall, it is the fifth largest provider of ETFs in the United States.  ProShares designs each of its ETFs to correspond to the performance of a daily benchmark — such as the price performance, the inverse of the price performance or a multiple of the inverse of the price performance — of an index or security.

5.     ProShares' ETFs are essentially divided into two categories: Ultra and UltraShort.

6.     ProShares sells its Ultra and UltraShort ETFs as "simple" directional plays.  As marketed by ProShares, Ultra ETFs are designed to go up when markets go up; UltraShort ETFs are designed to go up when markets go down.

7.     The SDD Fund is one of ProShares' UltraShort ETFs.

8.     The SDD Fund seeks daily investment results, before fees and expenses, that correspond to twice (200%) the inverse (opposite) of the daily performance of the S&P SmallCap 600 Index (the "SML Index").  The SDD Fund is mandated to take positions in securities and/or financial instruments that, in combination, should have similar daily return characteristics as -200% of the daily return of the SML Index.

9.     ProShares describes its strategy as "simple" to execute.  Defendant ProShare Advisors LLC ("ProShare Advisors" or the "Advisor"), which serves as the investment advisor

to the SDD Fund, purports to use a straightforward mathematical approach to investing.  Indeed, ProShares attributes its rapid growth to the "simplicity" its ETFs bring to implementing sophisticated investment strategies.  ProShares states that ProShares Advisors "determines the type, quantity and mix of investment positions that a[n ETF] should hold to simulate the performance of its daily benchmark," as opposed to advising ProShares to invest assets in stocks or financial instruments based on ProShare Advisors' view of the investment merit of a particular security, instrument, or company.

10.    The Registration Statement misled investors that the SDD Fund would deliver double the inverse return of the SML Index.

11.    For example, in 2008 the SML Index fell approximately 31 percent.  However, rather than increasing approximately 62 percent (double the inverse), the SDD Fund increased approximately 22 percent.  And, for example, from January 2, 2009 to July 30, 2009, the SML Index rose approximately 8.6 percent.  However, rather than decreasing approximately 17.2 percent (double the inverse), the SDD Fund fell approximately 40.5 percent over that period.

12.    ProShares does not market the SDD Fund or its other ETFs as day-trading vehicles.  ProShares' Chairman has publicly stated that investors can use ProShares' ETFs "for more than a day successfully."  ProShares imposes no temporal limits on investors in its UltraShort ETFs.

13.    ProShares' Registration Statement even provides hypothetical examples of fees that investors may encounter over 1-year, 3–year, 5–year, and 10-year periods, thereby misleading investors that the SDD Fund may be used for intermediate or long-term investing.

14.    The Registration Statement did not explain that, notwithstanding the name of the SDD Fund, the investment objective of the SDD Fund, and the purpose of ProShares' UltraShort

ETFs, the SDD Fund would — to a mathematical certainty — cause enormous losses if used for intermediate or long-term investing. The enormous losses are accelerated when the market becomes more volatile.

15.   On June 11, 2009, the Financial Industry Regulatory Authority ("FINRA") issued Regulatory Notice 09-31 (the "FINRA Notice"). The FINRA Notice cautioned that "inverse and leveraged ETFs . . . typically are unsuitable for retail investors who plan to hold them for longer than one trading session, particularly in volatile markets." FINRA reminded those who deal in non-traditional ETFs that sales materials related to leveraged and inverse ETFs "must be fair and accurate." Thereafter, FINRA spokesman Herb Perone stated: "Exotic ETFs, such as inverse, leveraged and inverse-leveraged ETFs, are extremely complicated and confusing products . . ." FINRA issued additional warnings on July 13, 2009, by way of a podcast on its website.

16.   Since FINRA's warnings, many financial companies, including Edward Jones & Co., UBS, Ameriprise Financial, LPL Investment Holdings Inc., Wells Fargo, Morgan Stanley Smith Barney, and Charles Schwab have either halted, or provided strongly worded warnings concerning, leveraged and/or inverse ETF trading.

17.   In a July 31, 2009 prospectus, ProShares stated that a leveraged fund "seeks investment results **for a single day only**" and that leveraged funds "**do not seek to achieve their stated investment objective over a period of time greater than one day.**" (Emphasis in original in both examples). These statements were misleading because, among other things, they omitted the fact that shares in the ETFs should only be used as short-term trading vehicles. Nonetheless, these statements, and the fact that they were now in bold, demonstrate that the earlier statements of "risk" were misleading.

18.    On August 18, 2009, the SEC issued an alert that began by stating: "The SEC staff and FINRA are issuing this Alert because we believe individual investors may be confused about the performance objectives of leveraged and inverse exchange-traded funds (ETFs). Leveraged and inverse ETFs typically are designed to achieve their stated performance objectives on a daily basis.  Some investors might invest in these ETFs with the expectation that the ETFs may meet their stated daily performance objectives over the long term as well. Investors should be aware that performance of these ETFs over a period longer than one day can differ significantly from their stated daily performance objectives."

19.    The SEC alert also stated: "Most leveraged and inverse ETFs 'reset' daily, meaning that they are designed to achieve their stated objectives on a daily basis.  Their performance over longer periods of time — over weeks or months or years — can differ significantly from the performance (or inverse of the performance) of their underlying index or benchmark during the same period of time.  This effect can be magnified in volatile markets."

20.    The SEC alert provided "two real-life examples" to "illustrate how returns on a leveraged or inverse ETF over longer periods can differ significantly from the performance (or inverse of the performance) of their underlying index or benchmark during the same period of time.

21.    The SEC alert states: "While there may be trading and hedging strategies that justify holding these investments longer than a day, buy-and-hold investors with an intermediate or long-term horizon should carefully consider whether these ETFs are appropriate for their portfolio.  As discussed above, because leveraged and inverse ETFs reset each day, their performance can quickly diverge from the performance of the underlying index or benchmark.

In other words, it is possible that you could suffer significant losses even if the long-term performance of the Index showed a gain."

22.     As a result of ProShares' misleading Registration Statement, Plaintiff and the Class have suffered millions of dollars in losses.

## JURISDICTION AND VENUE

23.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o.

24.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 22 of the Securities Act.

25.     Venue is proper in the District pursuant to 28 U.S.C. § 1391(b), because many of the acts and practices complained of herein occurred in substantial part in this District, and the shares of the SDD Fund trade in this District on the New York Stock Exchange Arca.

26.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

27.     Plaintiff purchased shares of the SDD Fund pursuant or traceable to the Registration Statement, and suffered harm thereby.

28.     Defendant ProShares, located at 7501 Wisconsin Avenue, Suite 1000, Bethesda, Maryland 20814, is a Delaware statutory trust organized on May 29, 2002.

29.     ProShares is registered with the SEC as an open-management investment company under the 1940 Act.  ProShares has a portfolio of ETFs, the shares of which are all listed on the New York Stock Exchange.  Each ProShares ETF has its own CUSIP number and

exchange trading symbol.  Each ProShares ETF issues and redeems shares on a continuous basis at net asset value ("NAV") in large, specified numbers of shares called "Creation Units."  For each ETF, a Creation Unit is comprised of 75,000 shares.  ProShares now manages over $20 billion, accounting for 99 percent of the country's short and leveraged ETFs.

30.     Defendant ProShares Advisors, located at 7501 Wisconsin Avenue, Suite 1000, Bethesda, Maryland 20814, serves as the investment advisor to the SDD Fund.  ProShares Advisors provides investment advice and management services to ProShares and its ETFs, including the SDD Fund.  ProShare Advisors oversees the investment and reinvestment of the assets in SDD Fund.

31.     ProShares Advisors is owned by Defendants Michael L. Sapir ("Sapir"), Louis M. Mayberg ("Mayberg") and William E. Seale.

32.     Defendant SEI Investments Distribution Co. ("SEI"), located at 1 Freedom Valley Drive, Oaks, Pennsylvania, 19456, is the distributor and principal underwriter for the SDD Fund. SEI has been registered with the SEC and FINRA since 1982.  SEI was hired by ProShares to distribute shares of the SDD Fund to broker/dealers and, ultimately, shareholders.

33.     Defendant Sapir, an interested trustee of ProShares, has been the Chairman and Chief Executive Officer of ProShares Advisors since its inception.  Sapir signed the Registration Statement.

34.     Defendant Mayberg has been President of ProShare Advisors since inception. Mayberg signed the Registration Statement.

35.     Defendant Russell S. Reynolds, III ("Reynolds') is a non-interested trustee of ProShares who signed the Registration Statement.

36.     Defendant Michael Wachs ("Wachs") is a non-interested trustee of ProShares who signed the Registration Statement.

37.     Defendant Simon D. Collier ("Collier") was ProShares' Treasurer from June 2006 through November 2008.  In his capacity as Treasurer, Collier signed the Registration Statement.

38.     The individuals referred to in ¶¶ 33 – 37 are collectively referred to herein as the "Individual Defendants."

39.     The Individual Defendants, in their respective roles, controlled the operations of the SDD Fund.  The Board of Trustees of ProShares is responsible for the general supervision of all of the SDD Fund.  The officers of ProShares are responsible for the day-to-day operations of the SDD Fund.

## CLASS ACTION ALLEGATIONS

40.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who acquired shares of the SDD Fund pursuant or traceable to the Trust's false and misleading Registration Statement and were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Trust at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

41.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class.

42.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

43.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

44.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.

45.    Among the questions of law and fact common to the Class are:

(a)    whether the Securities Act was violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public in the Registration Statement misrepresented material facts about the business, operations and/or management of ProShares; and

(c)    to what extent the members of the Class have sustained damages and the proper measures of damages.

46.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

47.    Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## BACKGROUND

**Traditional ETFs**

48.      ETFs are open-ended, with a unique creation and redemption feature that provides for the creation of large blocks of ETF shares only by authorized participants, which are usually institutional investors, specialists or market makers, who signed a participant agreement with a particular ETF sponsor or distributor to satisfy investor demand and provide market liquidity. ETFs are frequently considered low cost index mutual funds that trade like stocks.   ETFs, however, differ from traditional mutual funds in the following ways:

(a)      ETFs do not sell individual shares directly to investors and only issue shares in large blocks (75,000 shares, for example) that are known as "Creation Units";

(b)      Investors generally do not purchase Creation Units with cash.  Instead, investors buy Creation Units with a basket of securities that generally mirror an ETF portfolio;

(c)      After purchasing a Creation Unit, an investor often splits it up and sells the individual shares on secondary a market.  This permits other investors to purchase individual shares (instead of Creation Units); and

(d)      Investors who want to sell their ETF shares have two options: (1) they can sell individual shares to other investors on the secondary market, or (2) they can sell the Creation Units back to the ETF.  ETFs generally redeem Creation Units by giving investors the securities that comprise the portfolio instead of cash.

49.      In 1993, the American Stock Exchange launched the first traditional ETF, called the Spiders (or SPDR), which tracked the S&P 500.  Soon after, more ETFs were introduced to the market, for example the Diamonds ETF in 1998, which tracked the Dow Jones Industrial Average, and the Cubes in 1999, which tracked the NASDAQ 100.

**Non-Traditional/Leveraged ETFs**

50.     Non-traditional, or leveraged, ETFs are a new form of ETFs that seek to deliver multiples of the performance of the index or benchmark they track.  Some leveraged ETFs are "inverse" or "short" funds, meaning that they seek to deliver the opposite of the performance of the index or benchmark they track.  Like traditional ETFs, some inverse ETFs track broad indices, some are sector-specific, and still others are linked to commodities or currencies.  Inverse ETFs are often marketed as a way for investors to profit from, or at least hedge their exposure to, downward moving markets.

51.     Some non-traditional ETFs, such as the SDD Fund, are both short and leveraged, meaning that they seek to achieve a return that is a multiple of the inverse performance of the underlying index.  An inverse ETF that tracks the S&P 500, for example, seeks to deliver the inverse performance of the S&P 500, while a double-leveraging inverse S&P 500 ETF seeks to deliver twice the opposite of the index's performance.  To accomplish their objectives, leveraged and inverse ETFs pursue a range of complex investment strategies through the use of swaps, futures contracts and other derivative instruments.

52.     Most leveraged and inverse ETFs "reset" daily.  This results in "compounding" effects.  Using a two-day example, if the index goes from 100 to close at 101 on the first day and back down to close at 100 on the next day, the two-day return of an inverse ETF will be different than if the index had moved up to close at 110 the first day but then back down to close at 100 on the next day.  In the first case with low volatility, the inverse ETF loses 0.02 percent; but, in the more volatile scenario, the inverse ETF loses 1.82 percent.  The divergence effect increases significantly as volatility increases.

## SUBSTANTIVE ALLEGATIONS

**The SDD Fund**

53.     On or about January 22, 2007, ProShares registered the SDD Fund as an ETF. The SDD Fund seeks daily investment results, before fees and expenses, that correspond to twice (200%) the inverse (opposite) of the daily performance of the SML Index.

54.     According to the Prospectus on or about February 1, 2007, the SDD Fund takes positions in securities and/or financial instruments that, in combination, should have similar return characteristics as 200% of the inverse of the daily return of the index.  The SDD Fund's principal investment strategies included:

- Taking positions in financial instruments (including derivatives) that ProShare Advisors believes, in combination, should have similar daily price return characteristics as twice (200%) the inverse of the S&P SmallCap 600 Index. Information about the Index can be found on page 95.

- Committing at least 80% of its assets to investments that, in combination, have economic characteristics that are inverse to those of the Index.

- Employing leveraged investment techniques in seeking its investment objective.

- Investing assets not invested in financial instruments in debt securities and/or money market instruments.

55.     The SDD Fund is supposed to deliver double the inverse of the return of the SML. For example, from January 2, 2009 to July 30, 2009, the SML rose approximately 8.6 percent. However, rather than decreasing approximately 17.2 percent (double the inverse), the SDD Fund fell approximately 40.5 percent over that period.

56.     Given this dramatic tracking error, the fact that Plaintiff and the Class invested their monies on the correct directional play has been rendered meaningless.  The SDD Fund is, therefore, the equivalent of a defective product.  The SDD Fund does not do what it was designed to do, represented to do, or advertised to do.

57.     The Registration Statement does not disclose that the SDD Fund is altogether defective as a directional investment play.  In does not track 2x the inverse of the SML on a daily basis and it does not track 2x over periods longer than one day trading.  In order to sufficiently and accurately disclose this counterintuitive reality, the Registration Statement would have to clearly explain that, notwithstanding the name of the SDD Fund, the investment objective of the SDD Fund, and the purpose of ProShares' UltraShort ETFs generally, the SDD Fund would not perform consistently with investors' reasonable expectations.

58.     ProShares cavalierly states that the SDD Fund seeks to replicate double the inverse of the daily returns of SML, noting that it "does not seek to achieve its stated investment objective over a period of time greater than one day."  Of course, this statement does not warn that holding SDD Fund for more than a day will lead to enormous losses.  As ProShares knows, investors did not view ETFs as day trading investment vehicles and did not day trade the SDD Fund.  In fact, it is virtually economically impossible for all SDD Fund purchasers to sell out of their positions at the end of the day.

59.     Furthermore, ProShares does not market the SDD Fund or its other ETFs as day trading vehicles.  In fact, ProShares' Chairman has publicly stated that investors can use ETFs "for more than a day successfully."  ProShares' Registration Statement even provides hypothetical examples of fees that investors may encounter over 1-year, 3-year, 5-year, and 10 year periods.  There are no temporal limits placed on investors in the SDD Fund.

**The False and Misleading Registration Statement**

60.     On or about December 29, 2006, ProShares filed a Registration Statement with the SEC on Form N1-A, followed by ProShares' prospectuses dated January 23, 2007, and October 1, 2008, as supplemented on December 1, 2008, January 15, 2009, April 7, 2009 and May 26, 2009, as well as ProShares' Annual and Semi-Annual reports, and Statements of Additional Information (collectively, the "Registration Statement"). The Registration Statement was signed by the Individual Defendants.

61.     Primarily with respect to leverage, compounding, and volatility risks, the December 29, 2006 From NI-A disclosed:

> The **UltraShort S&P SmallCap 600 ProShares'** NAV and market price will likely be more volatile than the index underlying its benchmark and funds that do not employ leverage. Leverage should cause the Fund to lose more money in market environments adverse to its daily investment objective than an unleveraged investment.
>
> * * *
>
> **Volatility Risk**   UltraShort S&P SmallCap 600 ProShares seeks to achieve a multiple of an index and therefore will experience greater volatility than the index underlying its benchmark and consequently has the potential for greater losses.

62.     In its Annual Report, as of May 31, 2008, ProShares disclosed the following:

> **Compounding of Daily Returns and Volatility**:  ProShares ETFs are designed to provide either 200%, -200% or -100% of index performance on a daily basis (before fees and expenses).  A common misconception is that the Funds also should provide 200%, -200% or -100% of index performance over longer periods, such as a week, month or year. However, Fund returns over longer periods are generally less than or greater than the returns that would result from such an expectation.... This is due to several factors, but a significant one is index volatility and its effect on fund compounding.  In general, periods of higher index volatility will cause the effect of compounding to be more pronounced, while periods of lower index volatility will produce a more muted or even positive effect.  Index volatility measures how much an index's value fluctuates, in either direction, over time.  A higher volatility means that the

index has experienced more dramatic changes in value.  A lower volatility means that the index has changed at a steadier pace.

63.     The Statement of Additional Information to the October 1, 2009 Prospectus presented three tables intended to illustrate: (a) estimated fund return over one year when the fund objective is to seek daily investment results, before fund fees and expenses and leverage costs, that correspond to twice (200%) the daily performance of an index: (b) estimated fund return over one year when the fund objective is to seek daily investment results, before fees and expenses, that correspond to the inverse (-100%) of the daily performance of an index: and (c) estimated fund return over one year when the fund objective is to seek daily investment results, before fees and expenses, that correspond to twice the inverse (-200%) of the daily performance of an index.  Without additional narrative or explanation, ProShares states that these three tables are intended to isolate the effect of index volatility and index performance on the return of a leveraged Fund.  However, just as the other purported disclosures in the Registration Statement, these tables are insufficient to explain the miserable failure of the SDD Fund as a term trade or hedge.

64.     All of the purported disclosures alleged above were false or misleading because they failed to disclose:

- correlation between the SDD Fund and the inverse of the SML Index over time would only happen in the rarest circumstances, and inadvertently if at all;

- the extent to which performance of the SDD Fund would inevitably diverge from the inverse of the performance of the SML Index - *i.e.*, the probability, if not certainty, of spectacular tracking error;

- the severe consequences of high market volatility on the SDD Fund's investment objective and performance;

- the severe consequences of inherent path dependency in periods of high market volatility on the SDD Fund's performance.

- the role the SDD Fund plays in increasing market volatility, particularly in the last hour of trading;

- the SDD Fund causes dislocations in the stock market; and

- the SDD Fund offers a seemingly straightforward way to obtain desired exposure, but such exposure is not attainable through the SDD Fund.

65.     Perhaps most importantly, ProShares failed to disclose that mathematical compounding actually prevents the SDD Fund from achieving its stated investment objective over a period of time greater than one day.  Disclosures that merely state the return of the index over a period of time greater than one day multiplied by a fund's specified multiple or inverse multiple "may" or "will not generally" equal a fund's performance over that same period are misleading.

66.     ProShares' feeble attempt to explain the relationship between compounding and volatility vis-à-vis an acknowledgement that "periods of higher index volatility will cause the effect of compounding to be more pronounced" does not at all explain to investors that: (a) volatility erodes returns and wealth accumulation, a fact not commonly understood; (b) the path that returns take over time has important effects on mid- and long-term total return achieved; and (c) the return-volatility relationship matters even more so where leverage is employed.  In short, with a double leveraged ETF such as the SDD Fund, investors receive at least twice the risk of the inverse of the performance of the index but less than twice the return of the inverse of the performance. The drag imposed by return volatility makes such a result inevitable.

67.     Prospective and actual investors in ProShares have been misled.  The SDD Fund is not a "simple" kind of investment.  ProShares has violated the spirit and purpose of the registration requirements of the Securities Act, which are to protect investors by promoting full disclosure of information thought necessary to informed investment decisions." The registration provisions are designed not only to protect immediate recipients of distributed securities but also

subsequent purchasers from them.  Leveraged ETFs such as the SDD Fund do not constitute a

suitable or solid investment or hedging strategy for investors who intend to hold their positions

for longer than one day.  ProShares failed to disclose these material facts to Plaintiff and the

Class.

**Statement by FINRA & Others**

68.   In June 2009, FINRA issued Regulatory Notice 09-31, in which FINRA

"remind[ed] firms of their sales practice obligations in connection with leveraged and inverse

ETFs."  In particular, FINRA admonished that sale materials related to leveraged and inverse

ETFs "must be fair and accurate." FINRA further cautioned:

> **Suitability**
>
> NASD Rule 2310 requires that, before recommending the purchase, sale
> or exchange of security, a firm must have a reasonable basis for believing
> that the transaction is suitable for the customer to whom the
> recommendation is made.  This analysis has two components.  The first
> determining whether the product is suitable for any customer, an analysis
> that requires firms and associated persons to fully understand the products
> and transactions they recommend.
>
> *         *         *
>
> **Communications With the Public**
>
> NASD Rule 2210 prohibits firms and registered representatives from
> making false, exaggerated, unwarranted or misleading statements or
> claims in communications with the public.
>
> Therefore, all sales materials and oral presentations used by firm regarding
> leveraged and inverse ETFs must present a fair and balanced picture of
> both the risks and benefits of the funds, and may not omit any material
> fact or qualification that would cause such a communication to be
> misleading.

69.   On or about July 2, 2009, FINRA spokesman Herb Perone told Reuters: "Exotic

ETFs, such as inverse, leveraged and inverse-leveraged ETFs, *are extremely complicated and*

*confusing products,* and the marketing and sale of those products to unsophisticated retail and investors is very much on FINRA's radar screen."

70.     FINRA issued additional guidance on July 13, 2009 by way of a podcast on its website.   FINRA reiterated that most leveraged and inverse ETFs reset each day and are designed to achieve their stated objective on a daily basis—but with the effects of compounding over a longer time frame, results differ significantly.   In spite of this admonishment, Defendant Sapir maintains that ProShares' leveraged and inverse ETFs can be used "for more than a day successfully."

71.     On July 15, 2009, Massachusetts' Secretary of State William Galvin announced that Massachusetts had begun a probe into the sale practices of ProShares, among other firms heavily involved in structuring leveraged ETFs.   Galvin stated: "[s]ince 2006 these products have become increasingly popular.   Yet, due to the daily nature of the leverage employed, there is no guarantee of amplified annual returns and they generally incur greater transaction costs than traditional exchange traded funds."

72.     On July 21, 2009, as reported by the *Wall Street Journal* in an article entitled "Getting Personal, Edward Jones Drops ETFs," Edward Jones & Co. ("Edward Jones") halted the sale of its non-traditional, leveraged ETFs, such as the SDD Fund. Edward Jones called ETFs like the SDD Fund "one of the most misunderstood and potentially dangerous types of ETFs."

73.     On July 27, 2009, in a letter to wealth management clients, as reported by *The Wall Street Journal* in an article entitled "Strange Traded Funds," UBS said it would not trade ETFs that use leverage or sell any underlying asset short.   Similarly, on the heels of the FINRA Notice, Ameriprise Financial and LPL Investment Holdings Inc. have also prohibited sales of

leveraged ETFs that seek more than twice the long and short performance on their target index. Wells Fargo has stated that "[a]s a matter of firm policy, we can't solicit these products."

74.    On July 30, 2009, *The Wall Street Journal* published an article entitled "Warning Signs Up for Leveraged ETFs," in which it was reported that Morgan Stanley Smith Barney is reviewing how it sells leveraged ETFs.  Morgan Stanley Smith Barney has since curbed it use of non-traditional ETFs, ceasing to allow their use in traditional brokerage accounts.   The article also observed that Charles Schwab ("Schwab") issued an unusual warning on July 28 to clients who buy non-traditional ETFs.  Schwab offered a strongly worded warning on its website noting that *"while there may be limited occasions where a leveraged or inverse ETF may be useful for some types of investors, it is extremely important to understand that, for holding periods longer than a day, these funds may not give you the returns you may be expecting.… Proceed with extreme caution."*  (Emphasis added).  The disclosures in the Registration Statement simply do not rise to this "[p]roceed with extreme caution" level of clarity.

75.    On August 1, 2009, *Reuters* reported that Massachusetts subpoenaed four major financial institutions seeking details as to how leveraged ETFs are marketed and sold.

76.    On August 1, 2009, *The Wall Street Journal* quoted Morningstar's director of ETF analysis, Scott Burns, who observed: *"Hedges [like the SDD Fund] aren't supposed to become less trustworthy when you really need them."*  (Emphasis added).

## COUNT I
### (Violations of § 11 of the Securities Act Against All Defendants)

77.    This Count is brought pursuant to Section 11 of the 1933 Act, 15 U.S.C. § 77k, on behalf of the Class, against all Defendants.

78.    Plaintiff incorporates by reference the above paragraphs, as if set forth herein. This Count is asserted against all defendants.

79.     ProShares is the issuer of the shares sold via the Registration Statement.   The Individual Defendants are signatories and/or authorizers of the Registration Statement.

80.     Plaintiff and the other members of the Class purchased or otherwise acquired shares of the SDD Fund issued pursuant and/or traceable to the Registration Statement.

81.     Defendants are liable for the material misstatements in and omissions from the Registration Statement.

82.     Plaintiff and the other members of the Class purchased or otherwise acquired their SDD Fund shares without knowledge of the untruths or omissions alleged herein.

## COUNT II
### (Violations of § 15 of the Securities Act Against the Individual Defendants)

83.     Plaintiff incorporates by reference the above paragraphs, as if set forth herein. This Count is asserted against the Individual Defendants.

84.     Each of the Individual Defendants named herein acted as a controlling person of the Trust within the meaning of Section 15 of the Securities Act.   The Individual Defendants were trustees, officers and/or directors of ProShares charged with the legal responsibility of overseeing its operations.   Each controlling person had the power to influence and exercised the same to cause the controlled person to engage in the unlawful acts and conduct complained of herein.

85.     By reason of such conduct, the Defendants named in this Count are liable pursuant to Section 15 of the Securities Act.   As a direct and proximate result of their wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Fund.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.      determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as Class Representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

B.      awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      awarding punitive damages to Plaintiff and the other members of the Class;

D.      awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.      such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(a), plaintiff hereby demands a trial by jury of all issues so triable.

DATED: April 15, 2010

STULL, STULL & BRODY

By: _____
Jules Brody (JB-9151)
Aaron Brody (AB-5850)
6 East 45th Street
New York, New York 10017
Telephone: (212) 687-7230
Facsimile: (212) 490-2022

*Counsel for Plaintiff*

## PLAINTIFF CERTIFICATION

_____DAVID CHOW_____ ("Plaintiff") hereby states that:

1.      Plaintiff has reviewed the complaint and has authorized the filing of the complaint on his/her behalf.

2.      Plaintiff did not purchase any shares of the UltraShort SmallCap600 Fund (the "SDD Fund") offered by ProShares Trust ("ProShares" or the "Trust") at the direction of his/her counsel or in order to participate in this private action.

3.      Plaintiff is willing to serve as a lead plaintiff and/or representative party on behalf of a class, including providing testimony at deposition and trial if necessary. I understand that the litigation is not settled, this is not a claim form, and sharing in any recovery is not dependent upon execution of this Plaintiff Certification. I am willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action.

4.      All of Plaintiff's purchases and/or sales of the SDD Fund which are the subject of the complaint are set forth on the separate page annexed as Appendix A to this document.

5.      Plaintiff has not served or sought to serve as a representative party on behalf of a class under the federal securities laws during the last three years unless otherwise stated in the space below:

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of a class except to receive his pro rata share of any recovery, or as ordered or approved by the court including the award to a representative party of reasonable costs and expenses including lost wages relating to the representation of the class.

Plaintiff declares under penalty of perjury that the foregoing is true and correct.

Executed this ___26___ day of ____March_____, 2010

_____David Chow_____
Signature

## Appendix A

### UltraShort SmallCap600 Fund (Nasdaq: SDD)

| TRADE DATE | SECURITY/SYMBOL | QUANTITY | PRICE PER SHARE | PURCHASE / SALE |
|---|---|---|---|---|
| 4/2/08 | SDD | 562 | 72.00 | PURCHASE |
| 4/2/08 | | 250 | 72.58 | |
| 4/2/08 | | 500 | 72.63 | |
| 6/5/08 | | 500 | 64.29 | |
| 6/5/08 | | 500 | 64.35 | |
| 6/5/08 | | 600 | 64.36 | |
| 6/5/08 | | 100 | 65.05 | |
| 6/5/08 | | 500 | 65.073 | |
| 6/5/08 | | 1250 | 65.074 | |
| 9/4/08 | | 1000 | 52.82 | |
| 9/4/08 | | 500 | 52.81 | |
| 9/30/08 | | 300 | 45.31 | |
| 9/30/08 | | 685 | 45.33 | |
| 4/11/08 | | 1312 | 77.90 | SALE |
| 6/10/08 | | 3450 | 69.05 | SALE |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Please list additional transactions, if any, on a separate sheet of paper if necessary.